UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                   :
JEFFREY EARL HAMILTON,                                             :        12-CV-2091 (ARR)
                                                                   :
                Petitioner,                                        :        OPINION AND ORDER
                                                                   :
        -against-                                                  :
                                                                   :
UNITED STATES OF AMERICA,                                          :
                                                                   :
                Respondent.                                        :
                                                                   :
------------------------------------------------------------------- X

ROSS, United States District Judge:

On April 24, 2012, Jeffrey Earl Hamilton ("Hamilton" or "petitioner"), filed a petition for

a writ of habeas corpus pursuant to 28 U.S.C. § 2255. Hamilton claims that his trial counsel,

John Yu ("Yu"), was ineffective for: (1) advising petitioner that accepting the government's plea

offers would preclude him from challenging the role enhancement calculations, see Sentencing

Guidelines ("U.S.S.G.") § 3B1.1, set forth in those offers; (2) failing to conduct an adequate

investigation before either advising Hamilton to reject the plea offers or proceeding to trial; (3)

refusing to allow petitioner to testify at trial; and (4) failing to object, and subsequently raise on

appeal, that the introduction of a drug courier's address book at trial violated Hamilton's rights

under the Confrontation Clause. For the reasons stated below, the petition is denied.

## I. BACKGROUND

On January 30, 2006, the government filed an indictment against Hamilton, charging him

with: (1) conspiracy to import five kilograms or more of a substance containing cocaine in

violation of 21 U.S.C. §§ 963, 960(a)(1) and 960(b)(1)(B)(ii) (Count 1); conspiracy to possess

with intent to distribute five kilograms or more of a substance containing cocaine in violation of

21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II) (Count Two); and (3) conspiracy to possess with intent

to distribute marijuana in violation of 21 U.S.C. §§ 846 and 841(b)(1)(D) (Count Three).

Government Ex. ("GE") 1.  The government extended three plea offers to Hamilton prior to trial,

GE 2; GE 3; GE 4, at 2-3, each of which petitioner rejected, Transcript of June 11, 2013 Hearing

("Hr'g Tr.") 13, 17, 27.  Hamilton also declined to plead to the indictment.  Hr'g Tr. 29.

Subsequently, petitioner was tried before a jury and convicted of Counts One and Two.  Dkt. #1,

at 1; <u>see generally</u> Tr. of Trial, <u>United States v. Hamilton</u>, No. 06-cr-00064 (E.D.N.Y. Jan. 22-

26, 2007), Dkt. #52-57 ("Trial Tr.").

**A.      The Plea Offers**

The primary issue in this case involves the plea advice that Yu provided to Hamilton.

Had Hamilton accepted any of the government's plea offers, he would have received a

significantly lower advisory Sentencing Guidelines range than the one he was assigned following

his conviction.  As summarized below, the three plea offers that Hamilton received and rejected

contained different estimates with respect to the advisory Sentencing Guidelines:

        First Offer      Extended: October 3, 2006
                         Base Offense Level: 34
                         Role Adjustment: +4
                         Acceptance of Responsibility: -3
                         Total Offense Level: 35
                         Sentencing Range: 168-210 months

        Second Offer  Extended: October 23, 2006
                         Base Offense Level: 32
                         Role Adjustment: +4
                         Acceptance of Responsibility: -3
                         Total Offense Level: 33
                         Sentencing Range: 135-168 months

        Third Offer     Extended: October 27, 2006
                         Available through: October 31, 2006
                         Base Offense Level: 32
                         Role Adjustment: +3

> Acceptance of Responsibility: -3
> Total Offense Level: 32
> Sentencing Range: 121-151 months

GE 2, at 2-3; GE 3, at 2-3; GE 4, at 1-3; GE 5, at 1-2.

## B.  Hamilton's Sentence

At sentencing, the court determined petitioner's base offense level to be 34, Tr. of Sentence of the Court, United States v. Hamilton, No. 06-cr-00064, Dkt. #70 (E.D.N.Y. June 28, 2007) ("Sentencing Tr."), at 5, and imposed an aggravating role enhancement of three levels due to Hamilton's managerial or supervisory role in the conspiracies, id. at 7.  The court thus calculated Hamilton's adjusted offense level to be 37, which yielded an advisory sentencing range of 210 to 262 months.  Id. at 8.  Subsequently, the court imposed a sentence of 210 months imprisonment, which was within the advisory Sentencing Guidelines range.  Id. at 13.

Before imposing the sentence, the court had the following colloquy with Hamilton and Yu:

> THE COURT: Mr. Hamilton, is there anything you would like to say?
>
> . . . .
>
> THE DEFENDANT: There's been, really, a lot of misunderstanding, when I just got locked up, I spoke to Mr. Yu and I told my role, so I was really willing to accept my responsibility, but going to trial was not going to trial to say I'm innocent, because I'm accountable and responsible for what I was responsible for and not all the things that I was accused of.
>
> THE COURT: I'm sorry.  I'm not sure I understand.
>
> MR. YU: Judge, may I just—
>
> THE COURT: Yes.
>
> MR. YU: —because I've heard this argument before.
>
> THE COURT: Okay.

| MR. YU: | Mr. Hamilton wants to inform The Court that, from Day 1, he never denied that he was involved in the drug trade. He was involved in the drug trade. |
| | |
| | He told me he was involved, but he was not involved to the extent that the Government makes his participation to be, Your Honor; in large part, what Mr. Hamilton is saying: There was misunderstandings about his role. |
| | |
| | He had a very small role in the matter, Your Honor, and that's wh[y] he wanted to go to trial, to show that his role wasn't as extensive as the Government claimed. |
| | |
| [THE COURT:] | Is that correct, sir? |
| | |
| THE DEFENDANT: | Yes, ma'am. |

Id. at 10-11.

### C.    Hamilton's Evolving Claim as to Yu's Deficient Plea Advice

Petitioner now claims that, but for Yu's ineffective counsel, he would have accepted one of the government's plea offers. Notably, the contours of Hamilton's claim have changed substantially over the course of this case.

#### 1.    Petitioner's pro se papers

In his April 24, 2012 habeas petition, filed pro se, Hamilton initially claimed that Yu "was ineffective for advising Defendant to reject two plea agreements, each that would have resulted in a sentence substantially less than the 210 months Defendant received." Dkt. #1, at 4. Petitioner asserted that counsel advised him to "proceed to trial, despite the fact that a sentence under the Guidelines if convicted would have carried almost twice the penalty." Id.

In addition, Hamilton attached a sworn declaration to the petition that described his interactions with Yu. Dkt. #1, at 45-49. Hamilton asserted that he had informed Yu from the start that he "was guilty of some of the charges in the indictment, but not all charges alleged in

the indictment."  Id. at 45.  With respect to the first plea offer, Hamilton declared, "[Yu] advised me that in his professional opinion, He thinks it's not a reasonable plea offer, but He'll go back and talk to the Government and see if they'll make a better offer."  Id. at 46.  As for the second plea offer, Hamilton asserted, "[Yu] told me that the Government still insist.  I get the leadership role, unless I cooperate with the Government."  Id. at 47.  According to the declaration, Hamilton responded that he was unwilling to cooperate and that "Yu then told [him] that [they] got to start preparing for trial."  Id. at 48.

The declaration also included statements regarding Hamilton's interactions with Yu while defendant was preparing for trial.  According to petitioner, Yu met with Hamilton before trial and informed petitioner that "[h]e went over a lot of the discovery including some of the 3500 material briefly."  Id.  The declaration further states:  "[Yu] then said remember at first I told you it was looking steep gesturing upwards with his hands.  But now it's looking good for us gesturing downwards with his hands."  Id.  According to Hamilton, Yu continued, "I think you have a good chance of winning at trial.  They have nothing against you.  I think we should give it a shot."  Id.

With respect to the trial itself, Hamilton declared, "About the third day during the trial, . . . the evidence was becoming overwhelming, evidence I never seen during the pretrial."  Id. at 48-49.  Based on the "overwhelming" evidence, Hamilton told Yu that he wanted to plead guilty, but Yu advised petitioner to continue with the trial and preserve his rights on appeal.  Id. at 49.  In conclusion, Hamilton asserted, "[B]ecause my counsel was ineffective, the length of my incarceration was increased from . . . the 135-168 months the Government offered to 210 months, my current sentence."  Id.

Thereafter, on August 27, 2012, Hamilton filed an additional pro se brief and affidavit in

support of his petition.  Dkt. #11.  In the affidavit, Hamilton asserted, "Based on my attorney's advice I rejected the United States' plea offer, which provided a sentencing range of 135 to 168 months."  Id. at 3.  "Had I been properly advised," petitioner continued, "I would have accepted the plea offer."  Id.

### 2.    Supplemental papers by Hamilton's counsel

Subsequently, the court appointed Jeffrey G. Pittell ("Pittell") to represent Hamilton. Pittell then submitted a supplemental memorandum in further support of Hamilton's petition. Dkt. #14.  In addition to reiterating Hamilton's argument that Yu had misadvised petitioner as to the strength of the government's case, Pittell asserted a new argument as to why Yu's plea advice was deficient: trial counsel had incorrectly advised petitioner that he "should proceed to trial in order to contest his Sentencing Guideline role in the offense."  Id. at 10-11.

Pittell contended that "Hamilton was willing to accept responsibility for his offense conduct, and only sought to contest his role in the offense."  Id. at 12.  Under these circumstances, counsel maintained, "there was no professionally competent reason for his counsel to advise him to proceed to trial.  By proceeding to trial, Mr. Hamilton lost the benefit of receiving the reduction, for acceptance of responsibility, as provided by the Sentencing Guidelines."  Id.  In other words, insofar as Hamilton sought to litigate only the sentencing issue of his role in the offense, then Yu should have advised petitioner to plead guilty and challenge the imposition of any role enhancement during a Fatico sentencing hearing.  Id. at 13; see generally United States v. Fatico, 603 F.2d 1053, 1054 (2d Cir. 1979).

### D.    The Evidentiary Hearing

On June 11, 2013, the court held an evidentiary hearing to adduce testimony regarding the plea advice that Hamilton had received from Yu and Thomas J. Sullivan, an attorney who, at

Yu's request, had also reviewed Hamilton's case and advised petitioner regarding the government's plea offers. Hr'g Tr. 22. Yu, Sullivan, and Hamilton all testified at the hearing. In addition, the government introduced several recorded telephone conversations between Hamilton and an unidentified female that occurred while petitioner was incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn. GE 11-17. In these conversations, Hamilton discussed his interactions with Yu relating to the plea deals and articulated his objections to the government's offers. See id.

In general, the court found the testimony of Yu and Sullivan to be highly credible and consistent with respect to the attorneys' communications to Hamilton regarding the strength of the government's case and the evidence against petitioner; their advice to petitioner regarding the benefits of pleading rather than going to trial; and Hamilton's reasons for not accepting their advice that petitioner plead guilty.

In contrast, the court had substantial doubts about Hamilton's credibility. With respect to several critical issues, petitioner's testimony contradicted the statements that he had made in his habeas petition and supporting documents. The court was left with the distinct impression that, rather than simply telling the truth, Hamilton tried to shape his testimony to conform to Pittell's new theory as to why Yu's plea advice was ineffective. Although the court credits certain statements made by Hamilton—including petitioner's insistence that his primary objection to the plea offers was the government's characterization of his role in the offense—the court remains unconvinced by Hamilton's assertion that he would have pleaded guilty but for Yu's allegedly deficient advice.

### 1. Yu's Testimony

The court finds that Yu testified credibly regarding his interactions with Hamilton.

### a. Initial interactions

During their initial meeting, Yu advised Hamilton that, "based upon the charges in the indictment, [petitioner] was facing . . . a minimum of 10 years with a maximum of life." Hr'g Tr. 36-37. In addition, Yu recalled that Hamilton informed him very early on that petitioner "was a small time drug dealer." Id. at 34; accord id. at 59. As Yu further explained, Hamilton never claimed innocence; instead, petitioner denied involvement in "the conspiracy aspect" of the drug charges. Id. at 59.

### b. First plea offer

At the time that he received the first offer, Yu recalled, he already "thought the government had a rather strong case against Mr. Hamilton." Id. at 14. Yu's perception was based in part on the prosecutor's disclosure that "there were going to be at least three coconspirators testifying against Mr. Hamilton at the trial." Id. Based on his review of the evidence produced by the government up to that point, id., Yu advised Hamilton that "under the circumstances he should consider taking a plea in this case," id. at 15. As Yu credibly testified, "I thought at trial he would lose and I informed him of that." Id. In addition, the court credits Yu's testimony that, in the course of that discussion, he reviewed with Hamilton the evidence that he expected the government to put on at trial. Id. Among other things, Yu recalled communicating to petitioner "that the number of coconspirators testifying against him . . . made his case a rather difficult one." Id. at 16. Yu also calculated Hamilton's sentencing exposure and shared that with petitioner. Id. at 68.

The court also finds Yu's testimony regarding Hamilton's response to the first plea offer to be truthful. Recalling that "Hamilton was not too pleased with this particular offer," id. at 16, counsel acknowledged that petitioner's "primary objection was the [four-point] role

enhancement in the plea agreement." Id. at 47; accord id. at 16, 49.  As Yu further explained, "I think it was—his role was that of a managerial role in the overall conspiracy and a leadership role, which meant his exposure was greater." Id. at 16-17.  Because Hamilton "felt that the government overstated his role in the conspiracy," Yu testified, petitioner decided not to accept the plea offer and asked Yu "to go back and argue that issue with [the prosecutor] about the role adjustment." Id. at 17.  Thereafter, Yu communicated Hamilton's rejection of the first plea offer to the prosecutor, explained "the nature of the rejection," and asked the prosecutor "to consider adjusting the role status . . . to a lesser role." Id.

### c.    Second plea offer

Yu testified that the prosecutor responded with a second offer. Id.  Seeing that the new offer carried an advisory sentencing range of 135 to 168 months, which was a decrease from the 168 to 210-months range in the first plea offer, Yu "was very happy with it and . . . immediately went to see Mr. Hamilton to show him the plea offer." Id. at 19.  Yu credibly testified that he discussed the new offer with Hamilton, explained that petitioner's sentencing exposure would be "more than 25 years" if he went to trial and lost, id. at 21, and urged him to accept it, id. at 53.  Yu recalls that Hamilton was "startled" and "concerned" by this information, id. at 21, but that petitioner nonetheless indicated that he was unwilling to accept the plea, id. at 20.

As Yu explained, Hamilton remained bothered by the role adjustment in the plea offer. Id. at 19-20; accord id. at 51.  Indeed, Yu acknowledged that the role enhancement was "the main impediment to him accepting the offer." Id. at 51; accord id. at 52, 54.  According to Yu, Hamilton indicated, "I'm not taking it.  First of all, I didn't do that to cause four points adjustment." Id. at 51.  Although counsel agreed at one point during cross examination that the role enhancement was Hamilton's "only objection" to the plea agreement, id. at 51, he

subsequently clarified, "I'm not saying there weren't other issues that Mr. Hamilton may have had problems with. . . . The thing I recollect most vividly was his objection to the role enhancement." Id. at 51-52.  At the same time, Yu recalled that "Hamilton didn't believe that his coconspirators would come to court to testify against him." Id. at 51.  The court credits Yu's testimony regarding Hamilton's response to the second plea offer.

Counsel next testified that he became "very concerned," because "if [Hamilton] wasn't going to take the plea, that meant he was going to go to trial and [Yu] did not think this was a case that should be tried." Id. at 20.  The court finds truthful Yu's statement that he believed that Hamilton would lose at trial and thereby "get more time." Id. at 21.  At that point, Yu recalled, he realized that Hamilton "was not inclined to plead guilty in the case." Id.  Feeling "totally befuddled as to what was going to happen to Mr. Hamilton because of his intransigence with respect at the plea offers," Yu decided to invite Sullivan to provide petitioner with a second opinion. Id. at 22.

Yu testified credibly that he "went over the case in detail" and shared his copy of the relevant materials with Sullivan. Id. at 23-24.  Thereafter, Yu and Sullivan met with Hamilton. Id. at 24.  As Yu recalled, Sullivan urged Hamilton to accept the second plea offer, advising petitioner that "[t]his is not a case that you want to go to trial because you may lose." Id.  Yu also explained that although the plea offer carried "a 10 year minimum," Hamilton "could get a lot more time" if he went to trial and lost. Id. at 25.  The court also finds truthful Yu's statement that he discussed the case and reviewed the evidence "every time" he met with petitioner. Id.; accord id. at 70.  Despite the attorneys' efforts, Hamilton rejected the second plea offer. Id. at 25.  The court credits Yu's explanation as to why Sullivan became involved in this case and also finds veracious Yu's characterization of the exchange between Yu, Sullivan, and Hamilton.

**d.      Third plea offer**

During a court appearance on October 27, 2006, GE 4, Yu informed the prosecutor that Hamilton was not inclined to accept the second plea offer, Hr'g Tr. 27. Thereupon, the prosecutor orally conveyed the government's third and final offer. Id. The court finds truthful Yu's testimony that he advised Hamilton to accept the third offer, but that Hamilton "wanted to go to trial and . . . rejected that plea offer." Id. Notably, the third offer contained a three-point role enhancement rather than a four-point enhancement for role, GE 4, at 3, and Yu testified that he counseled Hamilton "that he should take the plea offer and if he takes the plea offer, he is going to have to accept the fact that his role is going to have a three-point enhancement." Id. at 61; accord id. at 72. Yu discussed Hamilton's sentencing exposure with petitioner, id. at 68, and told him that this was "the best offer" that he would receive, id. at 60. Counsel recalled, however, that Hamilton remained unwilling to accept the role enhancement. Id. at 56. As Yu explained, Hamilton wanted counsel "to get him safety valve," and "in order for qualify for the safety valve, a person cannot have a role enhancement in effect." Id.

In addition, Yu recalled that sometime before the third plea offer was extended, the prosecutor informed Yu that the government had intercepted a phone call in which Hamilton identified himself as "Chuckie." Id. at 73. Yu explained that "the fact that Mr. Hamilton allegedly used the name Chuckie was not good for Mr. Hamilton because the government alleged that Chuckie was one of the names Mr. Hamilton used during the course of the conspiracy." Id. Yu believed that petitioner's connection to "Chuckie" constituted "another line of evidence that was conceivably quite damning" and discussed this with Hamilton. Id. Although he informed Hamilton that this evidence "made the case more difficult," Yu testified, petitioner "didn't seem concerned about that." Id. at 74. Yu surmised, "I don't know if he

believed me whether or not that the government was going to bring that out during the trial." Id. The court credits Yu's characterization of Hamilton's lack of concern with respect to the "Chuckie" evidence, and, more generally, finds truthful counsel's testimony that Hamilton did not believe that his "coconspirators whoever they were were going to come to court." Id. In particular, the court credits Yu's statement that petitioner told Yu, "I don't think these people are coming. I have to see it." Id.

### e. Pleading to the indictment

In addition, Yu recounted that he discussed with petitioner the possibility of pleading to the indictment:

> Q    What do you recall, if anything, about those conversations?
>
> A    Well, because his main concern was the role adjustment, we had discussed the possibility of not accepting the government's plea offer but entering a plea with the Court to the charges and to have later on some type of Fatico hearing to determine exactly what his role in the conspiracy was. . . .  I said that is something that we can consider.  And he asked me: Well, what guarantees are there?  And I said there were no guarantees.  He asked me if it could go higher than the plea offer, and I said yes, it could.  I said I couldn't tell you because we have to do the hearing and the judge has to make the determination, so I could not say what the judge would say.
>
> Q    What was Mr. Hamilton's response to that advice?
>
> A    I'm not going to take a plea where I don't know what I'm looking at basically.
>
> Q    So what happened in the end?
>
> A    He decided to go to trial.

Id. at 28-29.

When questioned by Pittell whether "the purpose of the discussion for Mr. Hamilton to plead guilty to the indictment was so that he could challenge the role enhancement or the role adjustment in the sentence guidelines," Yu responded in the affirmative. Id. at 59. Counsel

likewise answered "yes" when Pittell inquired whether it was his understanding that if "Hamilton was going to take the government's offer, he was locked into initially four points now three points." Id. Yu acknowledged that it was his opinion that, aside from trial, "the only other way [petitioner] could challenge his role would have been to have pleaded guilty to the indictment." Id. at 65; accord id. at 59. As counsel explained to Hamilton, petitioner could plead guilty to the indictment and still challenge his role in the conspiracy during a Fatico hearing. Id. at 59-60. In contrast, Yu believed, if Hamilton "had taken [a] plea agreement, he would have been stuck with either the three or four points depending on which one he took." Id. at 65.

The court credits Yu's characterization of the discussions that counsel had with petitioner regarding the option of pleading to the indictment. The court also accepts as true Yu's description of his understanding that petitioner could have challenged his role in the offense if he pleaded guilty to the indictment, but not if petitioner accepted one of the government's plea offers. Likewise, the court finds truthful Yu's statement that he never advised Hamilton to go to trial. Id. at 30.

At trial, Yu recalled, the evidence against Hamilton proved to be "overwhelming," id. at 63, and petitioner expressed his desire to plead guilty, id. at 64. However, Yu advised Hamilton that he should not do so, id., because "the case had gone on for too long for him now to avail himself of a plea to the indictment before the Court," id. at 75.

## 2. Sullivan's Testimony

Yu's testimony was strongly corroborated by Sullivan's account. Sullivan testified that Yu approached him in the fall of 2006 for assistance in advising Hamilton with respect to the plea negotiations. Id. at 83-84. Specifically, Sullivan recalled that Yu asked him to speak to petitioner "about the nature of the offense, what the federal statues were, [and] what the

guidelines were." Id. at 84.  According to Sullivan, Yu discussed with him the discovery and evidence in the case, which involved numerous cooperating witnesses and recorded conversations.  Id.  In addition, Sullivan credibly testified that he reviewed the discovery evidence prior to his first meeting with Hamilton.  Id.

Sullivan testified that, during the first meeting, he shared his assessment of the strength of the government's case with petitioner.  Id. at 85.  Sullivan recalled that "the evidence was strong" in light of the cooperating witnesses and tape recordings, the transcripts for which counsel had reviewed.  Id.  In addition to emphasizing the strength of the case, Sullivan explained that "the guidelines that were contained were only estimates in the plea agreement, that the estimates were not binding on the sentencing Court . . . , [and that] they were no longer mandatory but that he should consider them because [counsel's] assessment was the guidelines were reasonable."  Id. at 85-86.

Sullivan testified that he met with Hamilton at least two times to discuss the government's first two plea offers.  Id. at 85, 91.  During those meetings, he advised Hamilton as to the meaning of the estimates in the plea agreement and as to "the government's chance of prevailing."  Id. at 86.  Sullivan also informed Hamilton of the sentencing exposure petitioner would face in the event of conviction at trial.  Id. at 89.  Ultimately, Sullivan told petitioner that "the plea agreements were reasonable and that he should consider them."  Id. at 87.  However, Sullivan recalled, petitioner "expressed concerns over the role enhancements."  Id.; accord id. at 94.  With respect to whether petitioner would be bound by the role enhancements set forth in the plea agreements, Sullivan testified, "It was my understanding that he would have to take the enhancement but it was up to the judge in the end."  Id. at 95.

The court credits Sullivan's testimony regarding his discussions with Hamilton.

### 3. Hamilton's Testimony

Although it was partially consistent with the testimony of Yu and Sullivan, Hamilton's account also diverged from those of the attorneys—and from the statements in petitioner's own papers—in several significant ways.

#### a. First plea offer

With respect to the first plea offer, Hamilton acknowledged that he had discussed the "specific terms" of the deal with Yu. Id. at 104. According to Hamilton, Yu characterized the agreement as "unreasonable" insofar as the government "always start[s] high." Id. at 103. Nonetheless, petitioner admitted, counsel advised him to accept the offer. Id. at 104. Notably, Hamilton's admission directly contradicts the statement in his habeas petition that Yu "advised Defendant to reject the plea agreement," Dkt. #1, at 4. When Yu discussed the aggravating role enhancement with Hamilton, petitioner responded that he "didn't like a leadership role." Hr'g Tr. 105. Consistent with Yu's account, Hamilton testified that Yu agreed to try to secure a more favorable offer. Id. at 106.

#### b. Second plea offer

Petitioner recalled that Yu then returned with a second offer in which the base offense level had changed from 34 to 32 but in which the role enhancement had remained the same. Id. Contradicting the statement in his habeas petition that "Counsel advised Defendant to reject the agreement and proceed to trial," Dkt. #1, at 4, Hamilton testified that Yu advised him to accept the second plea offer, Hr'g Tr. 108. In addition, petitioner averred that he told Yu that he "still didn't like the leadership role." Id. at 107, 108. According to Hamilton, Yu responded that if petitioner did not like the leadership role, then they would "probably have to start preparing for trial." Id. at 108.

### c.     Third plea offer

Hamilton testified that Yu also advised him to accept the third plea offer, id. at 110, which reduced petitioner's leadership enhancement from four to three points, id. at 112. However, petitioner told Yu that he still did not like the leadership role enhancement and that he wanted it to be reduced to "[z]ero." Id. at 110. According to Hamilton, Yu responded that "[t]he government ain't budging, they ain't moving." Id. Petitioner testified credibly that Yu never told him that he "still had the option of challenging the leadership role" if he pleaded guilty under the agreement. Id. at 112. The court likewise credits Hamilton's statement that he believed that he would have been "stuck with the three-point enhancement" if he accepted the guilty plea. Id.

However, the court disbelieves Hamilton's testimony that he would have pleaded guilty under the plea agreement had Yu advised him that he could still challenge the leadership role at sentencing. Id. at 112-13. Notably, petitioner never mentioned this issue in his habeas petition or original supporting documents. Id. at 117-19. Petitioner's omission casts substantial doubt on his testimony that his belief that he would be "stuck with the three-point enhancement" under the plea agreement constituted "the reason" why he did not accept the offer, id. at 112-13.

### d.     Pleading to the indictment

Hamilton also testified that another inmate informed him that he could plead to the indictment and challenge his leadership role. Id. at 111. Accordingly, petitioner averred, he brought up this potential course of action with Yu. Id. at 110-11. When asked by Pittell how Yu responded, Hamilton testified, "I don't remember exactly what his response was." Id. at 111. As discussed, however, Yu credibly testified that he had advised Hamilton that petitioner could plead to the indictment and still challenge his leadership role but that petitioner had rejected this

option after learning that "there were no guarantees" and that "it could go higher than the plea offer." Id. at 28.

### 4. The Phone Recordings

In addition to the testimony of Yu, Sullivan, and Hamilton, the evidence at the hearing included a number of recorded telephone conversations between Hamilton and an unidentified female that occurred while petitioner was incarcerated at the Brooklyn MDC. GE 11-17.

### a. Call occurring after extension of first plea offer

The government introduced into evidence one call, dated October 20, 2006, that Hamilton made between receiving and rejecting the first plea offer. GE 11, 12. In that call, petitioner balked at the length of his advisory Sentencing Guidelines range under the first plea agreement:

> A plea for one hundred and sixty eight months. I am telling him that I cannot do that. You know what I mean? Because that is my whole life right there. You know what I mean? I can't just give up my whole life like that. I am . . . I am going to tell him that I have kids and all these things. You know what I mean? So . . . My life is useless if I am to spend a hun . . . hundred and sixty eight months in jail.

GE 11, at 2 (ellipses in original).

In addition, Hamilton expressed his belief that the government had overstated his involvement in the crimes at issue:

> I am telling him that most of the things that are on the thing, I do not know anything about them. I don't know most of these people and he does not want to hear that. He is telling me his own thing and . . . you know . . . I am telling him that the government is not like that. The law is not like that. The law is not going to prosecute you for things that you do not know about. You know what I mean?

Id. at 3 (ellipses in original). Petitioner also explained that he had retained counsel for the purpose of going to trial: "[I]f you get an attorney, you know, you have to prepare to go to trial." Id. at 2.

**b.    Call occurring after extension of second plea offer**

In addition, the government introduced evidence of a call, dated October 26, 2006, that Hamilton made between receiving and rejecting the second plea offer.  GE 12.  In that call, petitioner mentioned that he had been offered a plea deal but that he was going to tell Yu that he could not accept the offer.  Id. at 2.

Apparently upset because Yu had requested additional payment before trying the case, Hamilton indicated that he would have simply accepted representation by a public defender or proceeded pro se had he wanted to plead guilty.  Id. at 4.  As petitioner related, "[H]e is claiming that he took that money to go to a plea.  So I am telling him that I could have gotten a plea with the public defender. . . . Or I could have done a plea on my own.  You know what I mean?"  Id.  Hamilton moreover suggested that Yu had his own—and not Hamilton's—best interest in mind in advising petitioner to accept the plea agreement; specifically, Hamilton voiced his suspicion that Yu did not want to try the case because "to go to trial is a lot of work," id. at 6, and Yu "did not expect that he was going to trial with that money," id. at 7.

**c.    Calls occurring after extension of third plea offer**

The government also introduced calls that Hamilton made from the MDC between receiving and rejecting the third plea offer.  GE 13; GE 14; GE 15.

In a call dated October 28, 2013, Hamilton mentioned that Yu had approached him with another plea deal.  GE 13, at 2, 6.  Once more, however, Hamilton expressed his unwillingness to accept the deal in light of his belief that he was not criminally responsible to the extent indicated by the government:  "He is just convincing, persuading me to take the plea but I am telling him no, it does not work like that because most of . . . what they allege that I did, I did not do, I did not do."  Id. at 2.  Petitioner continued, "I am not accepting things. . . . He brought a plea and

brought things that I should sign in court.  I just told him that I refuse to do that."  Id. (ellipsis in original).

In addition, Hamilton articulated his reluctance, in light of his family and other unspecified reasons, to simply plead guilty and thereby forfeit his chance of possibly prevailing at trial: "He came yesterday.  He was telling me that I should, I should take based on . . . . I am telling that no, I am not making any decisions because I have a family and stuff like that.  I can't do that, just take things and not know. . . . You know what I'm saying?"  Id. (ellipses in original). In response, the female with whom Hamilton was conversing inquired, "[Y]ou don't really want to, to go and then you get more, more time.  What do you think?"  Id. at 4.  Thereupon, Hamilton suggested that Yu was exaggerating the risks of proceeding to trial: "[N]o, he is just saying that, man.  He is just saying things his way."  Id.  Petitioner then indicated that, regardless of the possible consequences, he was willing to risk going to trial:

> [B]ut whatever the case, I told him I will take the chance, man.  Whatever the outcome is, I, I, I will be satisfied with it because I am just not. . . . I am not. . . . I have my kids and things like that.  I am not going to prison to, to do how much time for things that other people did . . . and leave my responsibility for that."

Id. (first two ellipses in original).  In another call later that day, the woman with whom Hamilton was speaking reiterated her concern that Hamilton would face more time if he went to trial and lost: "I don't want you to really go to do and get more.  That's my opinion."  GE 14, at 5.  In response, Hamilton stated, "Yeah.  Don't worry about that, man."  Id.

### d.    Calls occurring after rejection of third plea offer

Finally, the government introduced two calls that Hamilton made on the night of October 31, 2006, the day that he rejected the government's final plea offer.  GE 16; GE 17.  In these calls, Hamilton recounted that he and Yu had "a battle."  GE 16, at 2.  Hamilton explained that he had been doing his own research on the case and felt that Yu was trying push him in a

direction in which petitioner did not want to go.  Id.; accord GE 17, at 2-3.  Hamilton further

noted, "I don't feel like he is one hundred percent with me. . . . It's like he wants . . . to force me

to do some things that I don't really want to do and I am telling him that I don't really want to do

it and he is rushing me to."  GE 16, at 2.

Stating that "it seems like [Yu] is on the prosecutor's side," GE 17, at 2, Hamilton

accused Yu of wanting to do things "his own way or do it the prosecutor's way" rather than

comporting with petitioner's wishes.  Id. at 4.  Elaborating on his distrust for Yu, petitioner

continued, "Right now I am not listening to him because, he is not on my side as far as I am

concerned and certain thing that he is supposed to fight for me to get . . . . , that I am telling him

to fight for me to get, it's like he is leaning more to the prosecutor's side."  Id. at 5.

In particular, Hamilton expressed dissatisfaction with his perception of Yu's attitude that

petitioner "didn't stand a chance" and that he "should acknowledge everything . . . even things

that [he] was not guilty of."  Id. at 4.  Subsequently, the woman with whom Hamilton was

speaking voiced her concern that Yu had informed her that petitioner would be found guilty of

additional acts if he went to trial.  Id. at 7.  In response, petitioner stated, "He does not

understand what he is saying, man.  Let me tell you.  He is just trying to tell you all things to . . .

for you all to convince me [not to go to trial]."  Id.  Hamilton insisted, "I know what I am saying

you know. . . . He is just saying things and . . . he doesn't want me to fight is what I am saying."

Id.

Emphasizing that Yu "just wants to give up," Hamilton surmised that it had been

counsel's "intention since day one" to resolve the case through a plea agreement rather than trial.

GE 17, at 2.  Attributing Yu's advice that petitioner plead guilty to counsel's self-interest,

Hamilton surmised, "He does not want to do anymore work . . . . He is just trying to convince me

for the last couple. . . . It's the most he has ever come." <u>Id.</u> at 3. Moreover, Hamilton noted, "I saw that he does not . . . really want to go on with the case anymore because he wants more money." <u>Id.</u> at 5.

Hamilton added that Yu had tried to convince him to accept the plea offer by telling petitioner about the difficulties defendants faced with respect to conspiracy liability. According to petitioner, Yu had informed him that it was difficult for defendants to prevail on conspiracy charges because the government needed only "to find you guilty on a little thing in a conspiracy." GE 16, at 3. And once the government found that a defendant had been involved in "a little thing," <u>id.</u>, it could "lock them up and tell them that alright, if you go to trial, you will get twenty years or forty years." <u>Id.</u> at 4. For these reasons, Hamilton stated, Yu urged him to accept the plea offer. <u>Id.</u> at 3. However, Hamilton continued, "I am telling him that you cannot take a plea for something that you don't know about." <u>Id.</u> at 4.

Finally, Hamilton expressed his inability to accept the length of the advisory Sentencing Guidelines range in the plea offer: "The other day [Yu] called me. . . . He wanted to bring the plea. I am saying I cannot take a plea like this for fourteen years." GE 17, at 4. Petitioner continued, "[I]t's a ten year, ten year plea but . . . when you do time you would do eight and a half but I am not listening to him right now you know." <u>Id.</u> at 5.

## II. DISCUSSION

Petitioner argues that Yu's representation fell below the range of professionally competent assistance insofar as counsel: (1) advised Hamilton that accepting the government's plea offers would preclude him from challenging the role enhancement calculations, <u>see</u> Sentencing Guidelines ("U.S.S.G.") § 3B1.1, set forth in those offers; (2) failed to conduct an adequate investigation either prior to advising Hamilton to reject the plea offers or commencing

trial; (3) prevented petitioner from testifying at trial; and (4) failed to object, and subsequently raise on appeal, that the admission into evidence at trial of a drug courier's address book violated Hamilton's rights under the Confrontation Clause. The court concludes that none of these claims are meritorious.

To begin, a petitioner seeking a writ of habeas corpus on ineffective assistance of counsel grounds faces a heavy burden in establishing entitlement to relief. Strickland v. Washington, 466 U.S. 668 (1984), established a two-prong test by which ineffective assistance of counsel claims are adjudicated. Under Strickland, a petitioner must demonstrate, first, that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," id. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A court need not decide both prongs of the Strickland test if a there is an insufficient showing on one. See id. at 697.

Of particular relevance here, the Supreme Court has held that the Sixth Amendment right to counsel "extends to the plea-bargaining process." Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012). To establish prejudice under the second prong of Strickland "[i]n the context of pleas[,] a defendant must show the outcome of the plea process would have been different with competent advice." Id. When the prejudice alleged is "[h]aving to stand trial,"

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Id. at 1385.

**A.    Hamilton's Decisions to Reject the Plea Offers**

On behalf of Hamilton, Pittell argues that petitioner is entitled to habeas relief because Yu's advice with respect to the government's plea offers was both deficient and prejudicial under Strickland.  Specifically, Pittell contends that Yu's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," Strickland, 466 U.S. at 688, because Yu failed to advise petitioner that "he still had the right to challenge the calculation of his sentencing guideline role in the offense," Dkt. #24, at 3, under the terms of the plea agreements.  But for Yu's deficient performance, Pittell maintains, "the result would have been different because if he had known he still had this right, Mr. Hamilton would have pleaded guilty pursuant to one of the Plea Agreements."  Id.  The court disagrees.  Based on the totality of the record, the court concludes that, even if Yu had advised Hamilton of his right to challenge the role enhancements in the governments plea offers, there is not a reasonable probability that petitioner would have accepted one of the offers.[1]

**1.    Hamilton's concern with his role in the offense**

As an initial matter, the court credits the testimony of Hamilton, Yu, and Sullivan that petitioner's primary objection to the government's plea offers was the leadership role enhancement.  Petitioner and both attorneys testified consistently on this point.  Hamilton's concern about the role enhancement is moreover reflected in the plea offers themselves, insofar as the government reduced the enhancement from four points in the second offer to three points in the third offer.  As Yu testified, this reduction was made in response to Hamilton's objection to the enhancement, which Yu communicated to the prosecutor.

In addition, the court credits Hamilton's testimony that he believed that he would have

---

[1] Because the court holds that Hamilton suffered no prejudice from Yu's plea advice, it need not determine whether Yu's performance was deficient.  Instead, the court presumes deficiency and proceeds with the prejudice analysis.

been "stuck with" the leadership enhancement set forth in the plea agreements. Hr'g Tr. 112. Hamilton's testimony is corroborated by Yu's testimony that counsel believed that petitioner would be "locked into," id. at 59, and "stuck with," id. 65, a four- or three-point enhancement, depending on which plea offer he accepted. Even though each of the written plea agreements explicitly stated that the Sentencing Guidelines estimates contained therein were "not binding on the [U.S. Attorney's] Office, the Probation Department or the Court," Ex. 2, at 3; Ex. 4, at 3, the court is not persuaded that Hamilton understood this language—particularly where Yu testified to having a contrary understanding. And although Sullivan testified that he explained the non-binding nature of the Sentencing Guidelines calculations in the agreements, it is significant that petitioner's primary counsel testified to having a different understanding.

Furthermore, the court recognizes that Yu articulated at sentencing, on Hamilton's behalf, that petitioner "wanted to go to trial . . . to show that his role wasn't as extensive as the Government claimed." Sentencing Tr. 11. It must be noted, however, that petitioner made this representation in the context of trying to secure a reduced sentence by arguing that he had always accepted responsibility for his "involve[ment] in the drug trade." See id. In addition, the record suggests that Hamilton's protestations as to the extent of his culpability was, at least in part, grounded in his objections to co-conspirator liability rather than disagreement over his role in the offense. See generally United States v. Coplan, 703 F.3d 46, 71 (2d Cir. 2012) ("Under Pinkerton [v. United States], 328 U.S. 640 (1946)], [o]nce a conspiracy has been established, the criminal liability of its members extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy. . . . Pinkerton provides that a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant

as a consequence of their criminal agreement.") (second alteration in original ) (internal citations and quotation marks omitted). As Hamilton repeatedly claimed, "[M]ost of . . . what they allege that I did, I did not do, I did not do." GE 13, at 2; <u>see, e.g.</u>, GE 16, at 4; GE 17, at 4. In other words, a substantial motivating factor in Hamilton's decision not to plead guilty appears to have been his desire to avoid liability for the acts of his co-conspirators—a motivation that is related to, but distinct from, his desire to contest his role in the offense.

### 2. Petitioner's refusal to plead guilty to the indictment

In any event, the court finds that it is not reasonably probable that Hamilton would have accepted any of the government's plea offers—even if Yu had properly advised petitioner that he could do so and still challenge the imposition of a role enhancement. Perhaps most tellingly, Hamilton refused to plead to the indictment even though he knew that doing so would not preclude him from subsequently contesting his role in the conspiracy. Hr'g Tr. 28-29. Upon receiving Yu's advice about pleading to the indictment, petitioner inquired what "guarantees" there were. <u>Id.</u> at 28. In response, Yu informed Hamilton that "there were no guarantees" and that the sentence "could go higher than the plea offer." <u>Id.</u> Counsel moreover told petitioner that the court would hold a hearing and that Yu could not predict what sentence the judge would ultimately impose. <u>Id.</u> at 28-29. Based on this information, Hamilton responded, "I'm not going to take a plea where I don't know what I'm looking at basically." <u>Id.</u> at 29.

Yu's credible testimony makes clear that the determinative factor in petitioner's decision was ultimately the uncertainty inherent in the plea process. Even though Hamilton knew that he would maintain the right to challenge any role enhancement at sentencing if he pleaded to the indictment, he also knew that there would be no guarantee that his challenge would be successful. Without any "guarantees," <u>id.</u> at 28, as to what sentence the judge would ultimately

impose, Hamilton was unwilling to plead guilty to the indictment. Significantly, Hamilton's refusal to plead to the indictment shows that petitioner's decision did not hinge on the opportunity to argue for a zero role enhancement; rather, it depended on whether petitioner could secure a guarantee of a zero role enhancement.[2]

Hamilton's decision not to plead guilty to the indictment is indicative of how petitioner would have responded to the plea offers had Yu rendered competent plea advice. Under those circumstances, petitioner would have known—as he did with respect to the option of pleading to the indictment—not only that (1) he retained the right to contest his role in the offense at sentencing; but also that (2) the imposition of any role enhancement lay completely within the court's discretion. In other words, Hamilton would have known that pleading guilty under an agreement would have provided him with only the opportunity of arguing for a zero role enhancement and not the guarantee of a zero role enhancement. Without such a guarantee, the court concludes, there was no reasonable probability that Hamilton would have accepted one of the government's plea offers. As Hamilton had informed Yu, "I'm not going to take a plea where I don't know what I'm looking at basically." Id. at 29.

### 3. Hamilton's doubts as to the strengths of the government's case

The court's conclusion is corroborated by extensive evidence in the record that Hamilton disbelieved the advice he received from Yu and Sullivan regarding the strength of the government's case. As Yu credibly testified, Hamilton informed counsel that he did not believe

---

[2] Notably, whereas Hamilton understood correctly that the court would not have been bound to impose any particular sentence if petitioner pleaded guilty to the indictment, he believed—mistakenly—that the court would have been bound by the recommended Sentencing Guidelines calculations (including the role enhancement adjustment) if he pleaded guilty under one of the proposed agreements. As Hamilton testified, he believed that he would have been "stuck with" the leadership enhancement set forth in the plea agreements had he accepted one of those agreements. Id. at 112. Hamilton's mistaken belief about the binding nature of the Sentencing Guidelines recommendations is also reflected in his insistence that Yu continue negotiating with the prosecutor to reduce the role enhancement calculation in the plea agreements, as well as in petitioner's ultimate rejection of the plea offers when the calculations were not reduced to his satisfaction.

that his "coconspirators whoever they were were going to come to court." Id. at 74. Petitioner moreover told Yu, "I don't think these people are coming. I have to see it." Id. The court likewise credits Yu's testimony that petitioner "didn't seem concerned" about the intercepted phone call linking him to the name "Chuckie," even though Yu found this evidence to be "quite damning" and had informed petitioner as much. Id. at 73-74. Even Hamilton's declaration reveals that petitioner underestimated the showing that the government would make at trial; it was not until "[a]bout the third day during the trial" that petitioner realized that "the evidence was becoming overwhelming, evidence [that he had] never seen during the pretrial." Dkt. #1, at 48-49.

Petitioner's disbelief in the strength of the government's case is further substantiated by the phone calls that he made from MDC. Notably, the woman with whom Hamilton was speaking expressed her concern that Hamilton would face more time in jail if he went to trial and lost. GE 14, at 5. She also told Hamilton that Yu had informed her that petitioner would be found guilty of additional acts if he went to trial. GE 17, at 7. In response, Hamilton told her not to worry and asserted, "He is just trying to tell you all things . . . for you all to convince me [not to go to trial]." Id.

As the phone calls further reflect, Hamilton unfortunately mistrusted Yu and believed that counsel was not acting in petitioner's best interest in urging him to accept the government's plea offers. Specifically, the calls indicate that Hamilton believed that Yu was deterred by the work associated with trial and that counsel was unwilling to undertake that work for the amount of money that he had been paid. It thus appears that Hamilton thought that Yu, motivated by self-interest, was exaggerating the strength of the government's case and the risks of going to trial.

That Hamilton doubted the strength of the evidence against him supports the court's determination that petitioner would have proceeded to trial regardless of whether he knew he could enter into a plea agreement and still challenge his role in the offense at sentencing. Replete with evidence that Hamilton disbelieved Yu's evaluation of the government's case, the record suggests that petitioner chose to go to trial because he believed that he might prevail and was unwilling to give up his shot at an acquittal.

**4.     Petitioner's unwillingness to accept a lengthy sentence without a trial**

The recorded conversations moreover capture Hamilton's attitude that the length of time that he would serve under the plea agreements was simply too long and that, regardless of the risks, petitioner was unwilling to forfeit his chance of prevailing at trial.  As Hamilton told the woman with whom he was speaking, "[W]hatever the case, I told him I will take the chance, man.  Whatever the outcome is, I, I, I will be satisfied with it because I am just not. . . . I am not. . . . I have my kids and things like that."  GE 13, at 4.  Commenting on the second plea offer, Hamilton similarly indicated, "I am telling him that I cannot do that. . . . Because that is my whole life right there. . . . I can't just give up my whole life like that. . . . I am going to tell him that I have kids and all these things. . . . My life is useless if I am to spend a . . . hundred and sixty eight months in jail."  GE 11, at 2.  The calls reflect petitioner's sentiment that he could not affirmatively abdicate his responsibilities towards his family by acceding guilt and accepting incarceration without having fought his case at trial.  In addition, the phone calls suggest that Hamilton had retained Yu specifically for the purpose of going to trial, and that petitioner would have accepted representation by a public defender or proceeded pro se had he simply wanted to plead guilty.  Cf. Rodriguez v. United States, Nos. 11 Civ. 6707(NRB), 09 CR 58(NRB), 2013 WL 3388223, at *7 (S.D.N.Y. July 8, 2013) ("The fact that [petitioner] regretted his decision to

go to trial after being found guilty by a jury does not suggest that he was prepared to plead guilty prior to trial.").

### 5. Hamilton's conduct in the litigation

Finally, petitioner's conduct in this litigation also belies his purported reason for rejecting the government's plea offers. Notably, petitioner never mentioned in his habeas petition or original supporting documents Yu's failure to advise him of his right, under the terms of the plea agreements, to challenge his role in the offense at sentencing. Id. at 117-19. Petitioner's omission casts considerable doubt on his testimony that his belief that he would be "stuck with," id. at 112, the role enhancements set forth in the agreements constituted "the reason," id., why he did not accept any of the offers. Significantly, it was only after the court appointed Pittell to represent Hamilton that petitioner began asserting the claim that he now makes. The court is left with the impression that the basis for Hamilton's current argument originated with habeas counsel (who has undoubtedly represented petitioner with great skill and diligence) rather than with petitioner.

Ultimately, the court disbelieves petitioner's testimony that he would have pleaded guilty but for Yu's allegedly deficient plea advice. Hamilton's lack of veracity as to this critical issue—and his willingness to misrepresent the facts to secure habeas relief—is reflected in the significant contradictions between the statements in his petition and at the hearing. Perhaps most strikingly, Hamilton initially insisted that Yu had advised him to reject the two written plea offers. Only after the government disclosed the tape recordings that clearly indicated otherwise did petitioner admit that Yu had, in fact, repeatedly urged him to accept the deals. Similarly, Hamilton originally maintained that Yu had failed to advise him with respect to his sentencing exposure in the event of a conviction at trial. After being confronted with strong evidence to the

contrary, however, petitioner abandoned that position at the hearing. In addition, petitioner initially claimed that Yu had misadvised him as to the strength of the government's case prior to trial; indeed, petitioner went so far as to insist in his declaration that, on the eve of trial, Yu had told him, "I think you have a good chance of winning at trial. They have nothing against you. I think we should give it a shot." Dkt. #1, at 48. However, Hamilton's statements in this regard were squarely contradicted by the credible testimony of Yu and Sullivan at the evidentiary hearing.

***

In sum, although petitioner's legal argument is persuasive on its face, it is not supported by a factual basis sufficient to establish a reasonable probability that, but for Yu's alleged deficiency, Hamilton would have accepted one of the government's plea offers. Accordingly, the court concludes that Hamilton suffered no prejudice from Yu's plea advice.

## B.     Yu's Investigations

Hamilton also argues that Yu "was ineffective for failure to conduct an adequate or reasonable investigation prior to advising Defendant to reject two plea agreements" and "for failure to conduct an adequate or reasonable investigation in preparation of a strategy for jury trial." Dkt. #1, at 4. In Strickland, the Supreme Court recognized that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. The Court further instructed that, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id.

### 1.     Counsel's investigations with respect to the plea offers

Petitioner first insists that Yu "had no realistic outline of what evidentiary strengths the government's case-in-chief held." Dkt. #1, at 5. He further maintains that "counsel had not discussed with Defendant what sentence range Defendant would face under the Sentencing Guidelines if convicted at a jury trial versus entering a plea of guilt." Id.

However, petitioner's claim is contradicted by Yu's credible testimony. Yu testified that that, at the time that the government extended its first plea offer, he had already assessed the strength of the government's case and concluded that there was a strong case against Hamilton. Hr'g Tr. 14. As Yu explained, the prosecutor had informed him from the outset that there would be at least three coconspirators testifying against Hamilton. Id. The number of testifying co-conspirators, Yu recalled, made petitioner's case "a rather difficult one." Id. at 16. In addition, Yu averred that "the government produced some of the evidence . . . in the course of or prior to the plea negotiations," and Yu had reviewed these materials. Id. at 14. The court credits Yu's testimony that, in advising Hamilton about the first plea offer, defense counsel discussed the strength of the government's case, "review[e]d some of the evidence that [he] expected the government to put on at trial," and communicated his belief that petitioner would lose at trial based on "the total circumstances of his case." Id. at 15.

With respect to the second plea offer, Yu testified credibly that he first discussed Hamilton's sentencing exposure with petitioner during an initial meeting: "I said if I got to trial and you lose, I believe your exposure will be . . . more than 25 years." Id. at 21. Yu recalled that Hamilton was "startled" and "concerned" by this information. Id. Realizing that Hamilton was nonetheless not inclined to accept the offer, Yu became "very concerned," id., and asked Sullivan to provide petitioner with a second opinion, id. at 22-23.

To prepare Sullivan, Yu "went over the case in detail with him," id. at 23, and provided

Sullivan with the materials in Yu's possession, id. at 24. Thereafter, Yu and Sullivan met with Hamilton, and Yu again discussed Hamilton's sentencing exposure with petitioner. Id. at 24. In particular, Yu told Hamilton that although he would face a ten-year mandatory minimum if he pled guilty, petitioner "could get a lot more time" if he went to trial and lost. Id. at 25. When asked whether he also reviewed some of the evidence with petitioner during the course of that discussion, Yu recalled, "[E]very time I went to visit him, we discussed his case and went over evidence." Id.

Based on the record produced at the evidentiary hearing, the court finds that Yu had acquired an adequate understanding of the strengths of the government's case against Hamilton and that counsel communicated this information to petitioner. In addition to discussing the available evidence with Hamilton, Yu informed petitioner of his likelihood of losing at trial and of the significantly heightened sentencing exposure that petitioner should then expect. The court credits Yu's testimony that he reviewed all the evidence that the government provided to him prior to trial and that he shared this evidence with Hamilton in the course of reviewing the successive plea agreements. Id. at 70. Accordingly, the court concludes that Yu performed an adequate investigation of Hamilton's case before advising petitioner as to the government's plea offers. Petitioner has failed to satisfy Strickland's first prong.

### 2. Counsel's investigations in preparation for trial

Hamilton next contends that Yu was ineffective "for failure to conduct an adequate or reasonable investigation in preparation of a strategy for jury trial." Dkt. #1, at 4. Petitioner maintains that "trial counsel had no viable trial strategy and could not have prepared an adequate[] defense." Id. at 20.

Hamilton, however, has adduced no support for his claim that Yu "prepared no defense

and tried the case with the hope that Rule 29 motion would be granted," id. at 22. Indeed, even

petitioner acknowledges that Yu pursued a strategy of "cross-examining witnesses in attempts to

create the appearance of reasonable doubt." Id. at 21. The record reflects that Yu recognized

that the government's case against Hamilton rested largely on the testimony of co-conspirators.

See, e.g., Trial Tr. 37-44. This recognition is reflected in Yu's strategy of challenging the co-

conspirators' credibility by, for example, emphasizing that they were convicted felons and

maintaining that their cooperation agreements with the government made them biased. See, e.g.,

id. at 37-38; cf. Dixon v. United States, No. 07 CV 829, 2010 WL 3311837, at *3 (E.D.N.Y.

Aug. 19, 2010) ("Counsel's decision to . . . focus the jury instead on the adequacy of the

government's proof of the existence of a racketeering enterprise and the credibility of the

cooperating witnesses, themselves violent criminals, falls easily within the realm of reasonable

trial strategy . . . ."); Smith v. Berbary, No. 05–CV–0069, 2009 WL 3165611, at *7 (W.D.N.Y.

Sept. 25, 2009) ("A review of the record shows that counsel's strategy was reasonable, as . . .

counsel zealously attacked the credibility of the evidence relating to the robbery charge through

cross-examination."). In addition, the trial transcript demonstrates that Yu attempted to highlight

gaps in the government's evidence with respect to Hamilton's involvement in the conspiracies.

See, e.g., Trial Tr. 39-43.

In light of Yu's performance at trial, Hamilton has failed to prove that defense counsel

undertook a deficient pretrial investigation. The trial transcript reflects Yu's understanding of

the strengths and weaknesses of the government's case, an understanding that demonstrates the

adequacy of Yu's pretrial investigation. Once again, petitioner has failed to satisfy the first

prong of Strickland.

## C. Hamilton's Decision Not to Testify

In addition, Hamilton argues that he was deprived of the effective assistance of counsel when Yu "failed to call Defendant as a witness in his own right." Dkt. #1, at 4. This claim has no merit.

The Second Circuit has recognized that "the burden of ensuring that the defendant is informed of the nature and existence of the right to testify rests upon defense counsel." Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997). Accordingly, "any claim by the defendant that defense counsel has not discharged this responsibility—either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify—must satisfy the two-prong test established in Strickland . . . for assessing whether counsel has rendered constitutionally ineffective assistance." Id. (internal citation omitted).

Here, Hamilton's insistence that "Yu refused to allow Defendant to testify," id., is directly contradicted by the record. During a side bar conference on January 26, 2007, the following exchange occurred between the court, Yu, and Hamilton:

> THE COURT: I gather that you spoke with Mr. Hamilton whether or not he wishes to take the stand?
>
> MR. YU: Yes. I had an opportunity to speak to him downstairs and I did speak to him and we discussed my client's thought about testifying in this matter and after our conversation my client informed me that he no longer wishes to testify in this case and I came up immediately to tell your Honor.
>
> THE COURT: Mr. Hamilton, I know that you have gone over this many, many times in the last weeks and months. As you understand you have a right to testify if you wish to do so. Obviously no one can force you to testify and I will tell the jury that they cannot hold that against you. I know that you advise of counsel [sic]. Ultimately, the decision is yours. Am I correct that you did not wish to testify?

THE DEFENDANT: Yes, Ma'am.

Trial Tr. 1012-13. Contrary to Hamilton's claim that "Yu impeded Defendant's right to testify at trial," Dkt. #1, at 1, the trial transcript reflects that it was petitioner who chose not to testify after extended conversations with Yu about this matter. Accordingly, Hamilton has failed to demonstrate that Yu performed deficiently with respect to petitioner's right to testify.

**D.    Admission of Address Book Belonging to Drug Courier Michelle Diamond**

Finally, Hamilton maintains that Yu "was ineffective for failing to object to the introduction of Michelle Diamond's diary[3] as evidence at trial [because] [i]ntroducing the diary at trial violated Defendant's right to confront accusers and cross-examine witnesses." Id. at 5. Petitioner also argues that Yu was ineffective for failing to raise this issue on appeal. Id. This claim is devoid of merit.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause prohibits the admission of out-of-court 'testimonial' statements against a criminal defendant, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant." United States v. Williams, 506 F.3d 151, 155-56 (2d Cir. 2007). In accordance with Crawford, the Second Circuit has emphasized that "the right to confrontation only extends to testimonial statements, or, put differently, the Confrontation Clause simply has no application to nontestimonial statements." See United States v. Feliz, 467 F.3d 227, 231 (2d Cir. 2006). Although the Supreme Court did not set forth a comprehensive definition of the term "testimonial" in Crawford, it provided examples of what falls within the "core class" of "testimonial statements":

---

[3] It appears that Hamilton objects to the admission of Diamond's address book rather than diary. See Trial Tr. 334.

ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

541 U.S. at 51-52 (first alteration in original) (internal citations and quotations omitted).

Here, the entries in Diamond's address book "bear none of the hallmarks of testimonial statements identified in Crawford," Williams, 506 F.3d at 156-57. The evidence at trial established that Diamond was a drug courier in the cocaine-related conspiracies for which Hamilton was ultimately convicted. See generally Trial Tr. 328-47. Diamond's address book was seized during her arrest, id. at 334, and contained a note, "Call Chucky, leave Friday afternoon, 3:00 to 7:00 pm," id. at 335. The address book also included a phone number entry of (876) 869-7867 for "Chucky Short Man." Id. at 336. This number matched the business phone number listed for Hamilton on a non-immigrant visa application. Id. at 336-37. The entries in Diamond's address book bear no resemblance to "a declarant's knowing responses to structured questioning in an investigative environment or in a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004). Accordingly, the court concludes that they were not "testimonial" statements within the meaning of Crawford.

Because Hamilton did not have the right to confront Diamond about the statements in her address book, Yu did not perform deficiently with respect to the admission of this item into evidence.

## III. CONCLUSION

The petition for a writ of habeas corpus is denied. Because Hamilton has failed to make a

"substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court

declines to issue a certificate of appealability.  The Clerk of Court is directed to enter judgment

accordingly.

SO ORDERED.


/s/ _____
Allyne R. Ross
United States District Judge


Dated:        August 12, 2013
              Brooklyn, New York